

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00051-CV

_____

MARY FLENTGE MCAULEY, WILLIE O. FLENTGE, JR.,
AND CHARLES RAY FLENTGE, Appellants

V.

CARL DEAN FLENTGE, INDEPENDENT EXECUTOR OF THE ESTATE OF LAVERNA
FLENTGE, CARL DEAN FLENTGE, DAVID FLENTGE AND DANIEL JUNEK,
INDEPENDENT EXECUTOR OF THE ESTATE OF
WILLIE OTTO FLENTGE, SR., INDIVIDUALLY, AND AS SHAREHOLDERS
AND ON BEHALF OF W.L. RANCH, INC., Appellees

On Appeal from the 21st District Court
Burleson County, Texas
Trial Court No. 26,704

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

Willie Otto Flentge, Sr. (Willie Sr.), Willie O. Flentge, Jr. (Willie Jr.), and Carl Dean Flentge (Carl) formed W.L. Ranch, Inc. (the Ranch), in 1974. At the organizational meeting, the Ranch issued a total of 700 shares of stock, 100 shares each to (1) Willie Sr., (2) his wife, Laverna, and their five children, (3) Willie Jr., (4) Carl, (5) Mary Louise Flentge (Mary),[1] (6) David Lynn Flentge (David), and (7) Charles Ray Flentge (Charles). Willie Sr. served as the President and director of the Ranch until his death in August 2010. Pursuant to the corporate by-laws, transfer of the stock was restricted by a right of first refusal held by the Ranch.

Almost immediately after Willie Sr.'s death, a dispute arose between the shareholders for control of the Ranch based on competing interpretations of the transfer restriction. Specifically, the shareholders disagreed about whether Willie Sr. could transfer his 100 shares in the Ranch to Laverna under his will without first offering them for sale to the Ranch. Appellees/Cross-Appellants Laverna,[2] Carl, David, and Daniel Junek (Junek), the independent executor of Willie's estate (collectively the Flentge Shareholders), asserted that the transfer restriction did not apply to testamentary transfers and that Willie Sr.'s transfer to Laverna was valid, thereby preserving that group's majority of the shares and control of the Ranch.

Appellants/Cross-Appellees Mary, Willie Jr., and Charles (collectively the McAuley Shareholders) asserted that the transfer restriction did apply to testamentary transfers and that the

---

[1]Subsequent to the organizational meeting Mary married and changed her name to Mary Flentge McAuley.

[2]Laverna died during the pendency of this suit and Carl, as independent executor of the estate of Laverna, was substituted for her.

2

testamentary transfer to Laverna was invalid, giving neither party a majority of the shares. The McAuley Shareholders also asserted that they were elected corporate directors at a shareholder meeting held shortly after Willie Sr.'s death and, therefore, controlled the Ranch. The Flentge Shareholders denied the validity of the purported shareholder meeting and director election. They filed suit against the McAuley Shareholders seeking a declaratory judgment that, *inter alia*, Willie Sr.'s shares were not subject to the Ranch's right of first refusal. The Flentge Shareholders also asserted a cause of action against the McAuley Shareholders for breach of fiduciary duties relating to actions taken by them as purported directors. The McAuley Shareholders denied the Flentge Shareholders' allegations and filed a counter-claim seeking a declaratory judgment and an accounting and asserting causes of action for bad faith, breach of contract, breach of fiduciary duties, defamation, and costs and attorney fees for filing a frivolous petition under Section 15.51 of the Texas Business and Commerce Code.

During the course of litigation, the parties filed competing motions for partial summary judgment on the applicability of the transfer restriction to Willie Sr.'s testamentary transfer of his shares to Laverna. The 21st Judicial District Court of Burleson County[3] granted the Flentge Shareholders' motion for partial summary judgment and denied the McAuley Shareholders' motion for partial summary judgment. The case proceeded to trial on the Flentge Shareholders' claims that the McAuley Shareholders breached their fiduciary duties as officers of the Ranch. At the subsequent jury trial, however, the trial court granted a directed verdict against the Flentge

---

[3]Originally appealed to the Tenth Court of Appeals in Waco, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

Shareholders' breach of fiduciary duty claims. Accordingly, by virtue of its amended order granting partial summary judgment, the trial court entered a declaration in favor of the Flentge Shareholders holding that Willie Sr.'s shares were not subject to the Ranch's right of first refusal. By virtue of its directed verdict, the trial court also granted a take-nothing judgment in favor of the McAuley Shareholders on the Flentge Shareholders' claims for breach of fiduciary duty. Consequently, the trial court entered a final judgment granting the Flentge Shareholders attorney fees related to their declaratory judgment claims only.

In their appeal, the McAuley Shareholders assert that the trial court erred in denying their partial summary judgment motion and in granting the Flentge Shareholders' motion. The Flentge Shareholders cross-appeal, asserting that the trial court erred in granting the directed verdict because there is sufficient evidence to raise the following fact issues: (1) that the McAuley Shareholders breached their fiduciary duties to the Ranch and (2) that the McAuley Shareholders obtained a benefit resulting from their breach. The Flentge Shareholders also assert that the trial court's directed verdict prevented them from presenting a claim for reimbursement of attorney fees and expenses.

We find (1) that the McAuley Shareholders waived their complaint that summary judgment was improper by failing to brief all of the summary judgment grounds asserted at the trial court and (2) that there was insufficient evidence to raise a fact issue of whether the McAuley Shareholders obtained a benefit resulting from their breach of fiduciary duties. Therefore, we affirm the judgment of the trial court.

4

## I. Background Facts

### A. The Original Corporate Leadership

When the Ranch was organized in 1974, each of the shareholders was elected as an officer: Willie Sr. as president; Laverna as first executive vice-president; Willie Jr. and Carl as second executive vice-presidents; Mary as secretary; and David and Charles as third executive vice-presidents.[4] In addition, the first board of directors consisted of Willie Sr., Willie Jr., and Carl. Willie Sr. served as president of the Ranch until his death in August 2010. Mary, Charles, and Willie Jr. have continued to serve in their respective offices since that time.[5]

Apparently concerned about conflict within his family and the operation of the Ranch after his death, Willie Sr. and Laverna entered into an agreement with their banker, Junek. The agreement provided that, upon the death of both Willie Sr. and Laverna, Junek would serve as president of the Ranch. Junek saw his proposed role under the agreement as a peacekeeper. At a corporate meeting held about six weeks before his death, Willie Sr. introduced Junek to his

---

[4]Charles testified that, although he had the office of third vice-president, he had no duties.

[5]The parties also disagree about the identity of the corporate directors from 2007 until Willie Sr.'s death in 2010. The McAuley Shareholders testified that Willie Sr., Mary, and Charles were elected as the new board of directors on September 16, 2007, and point to the unsigned minutes of a corporate meeting held on that date. This claim was disputed by the Flentge Shareholders, who maintain that Willie Sr. and Laverna were the only board members elected on that date. They point to articles of amendment filed on April 15, 2008, which provide that the number of directors of the Ranch is two and name Willie Sr. and Laverna as the two directors. They also point to franchise tax information forms for 2008 and 2009 that recite that Willie Sr. and Laverna are the directors. They also note that the parties generally agree that the amended articles were introduced at a corporate meeting on April 26, 2009, and that nobody objected to them, or to Willie Sr. and Laverna being the only directors. Finally, they note that, in September 2007, Willie Sr., individually and as president of the Ranch, and Laverna executed an oil, gas, and mineral lease with Clayton Williams Energy (Williams Energy) covering the 260 acres owned by the Ranch. Nevertheless, the parties do not allege that any actions taken by the corporation prior to Willie Sr.'s death were invalid, and because the trial court granted the McAuley Shareholders' motion for directed verdict, the trial court never reached the issue of whether the purported 2007 board of director elections were valid. Therefore, we take no position on the validity of the purported 2007 board of director elections.

children as the person who would be the executor of his will and who would run the Ranch. Willie Sr. passed away on August 30, 2010.

### B.    Events After Willie Sr.'s Death

#### 1.    The November 20, 2010, Meeting

Within a month of Willie Sr.'s passing, the McAuley Shareholders began sending agendas and notices for proposed meetings. A corporate meeting, which was designated as a board meeting, was held on November 20, 2010 (the November 20 Meeting). The McAuley Shareholders were all in attendance. None of the Flentge Shareholders appeared in person, and the parties dispute whether Laverna and David attended by telephone. The minutes of the meeting, which were only signed by the McAuley Shareholders, recite that Laverna was in attendance and that David attended by telephone.[6] Nevertheless, according to the minutes of that meeting, Laverna, Mary, and Charles were elected as directors.[7] Also contained in the minutes is a statement attributed to Willie Jr. that Williams Energy was conducting a title search to determine how to divide the acreage on two producing oil wells.[8]

---

[6]The Flentge Shareholders dispute Laverna's attendance, and David denies both that it was a corporate meeting and that he was informed that it was a corporate meeting. Also, no one representing the shares owned by Willie Sr. was in attendance. It is undisputed that Carl did not attend in any manner.

[7]Mary's and Charles' election to the board of directors was later nullified by the trial court for failure to follow the corporate bylaws. This action by the trial court is not challenged on appeal.

[8]At the time, there were two producing oil wells on which the parties were receiving royalties. In the November 20, 2010, minutes these wells are referred to as the "W L Ranch, Inc. 1 H" and the "W L Ranch 2 H" wells. It was later clarified that the first well (W.L. Ranch Unit #1H) was drilled on Ranch property in the Austin Chalk formation and that a second well (Ayers-Jackson Unit #1) was drilled on adjoining acreage with which it was unitized. An agreed order was entered by the trial court on February 7, 2012, that required Williams Energy to pay all money held or payable in the future to the Ranch or any of its shareholders into the registry of the trial court. In the order, the wells are referred to respectively as the Williams Energy Property No. 91442-001, commonly known as the W.L. Ranch Unit #1H, and the Williams Energy Property No. 06293-001, commonly known as the Ayers-Jackson Unit #1. These

6

## 2. Actions Taken By the McAuley Shareholders After the November 20, 2010, Meeting

One week later, Mary and Charles, representing themselves to be directors, wrote to Citizens State Bank in Caldwell requesting internet access to the Ranch's bank account and copies of the last three years' statements. This attempt was not successful. Subsequently, the McAuley Shareholders opened a separate bank account in the name of the Ranch at Prosperity Bank in Dripping Springs. This account was funded by the personal funds of Mary, Charles, and Willie Jr., and no corporate funds were ever transferred to the Prosperity Bank account. It was explained that the account was opened to allow Mary to pay expenses associated with her office as secretary of the Ranch. It is undisputed that the McAuley Shareholders did not disclose the opening of this account to Laverna, Carl, David, or Junek, who had been appointed executor of Willie Sr.'s estate.

In addition, in December 2010, Mary filed a statement of change of registered office/agent with the Texas Secretary of State's Office, designating herself as the new registered agent and providing her home address as the new registered office address of the Ranch. Mary admitted that no document, vote, approval, or agreement existed appointing her as the registered agent or designating her address as the registered office of the Ranch. In October 2011, Mary filed purported articles of amendment with the Secretary of State, again naming herself as the new registered agent and providing her home address as the new registered office address of the Ranch. She admitted that she was not the registered agent when she filed this document.

---

will be referred to as the "W.L. Ranch 1H Well" and the "Ayers-Jackson Well," respectively. Subsequently, a third producing well was drilled in the Eagle Ford formation (the Buckman Well).

### 3. The McAuley Shareholders' Correspondence and Dealings with Williams Energy

Sometime in January 2011, a letter containing Mary's signature[9] was sent to Williams Energy. The letter represented that Mary had been appointed the temporary registered agent of the Ranch at the November 20 meeting and requested that all correspondence, documentation, checks, and notices be forwarded to her. Mary admitted that she had not been appointed temporary registered agent at the November 20 meeting. In a letter dated January 24, 2011, and referencing the W.L. Ranch 1H Well, Williams Energy acknowledged receipt of the letter and requested additional documentation of Mary's appointment as registered agent. In addition, the letter stated,

> We must also advise you that the royalties for this and all owners in the above referenced unit have been suspended pending reformation of the well. Once we have received a division order, title opinion, and the documentation requested above we will send out new division orders on the reformed well.

Charles explained that for the W.L. Ranch 1H Well, Williams Energy wanted all the shareholders to reassign their percentages to it so it could drill the second well. He testified that they did so and that Williams Energy would "reform the land," drill the second well, and then pay them the money they were holding back. Willie Jr. testified that, sometime after his father's death, he communicated with Williams Energy to have royalties paid in a different manner than they were at the time of his father's death. There was no testimony regarding the substance of this communication.

David testified that he met with some staff members of Williams Energy either before or after Christmas 2010 or 2011 because the royalty payments to the Ranch and the shareholders had

---

[9]Although Mary admitted that the letter contained her signature, she denied writing, signing, or sending the letter.

stopped coming in October and he wanted to know why. He stated that the Williams Energy staff gave him a "Secretary of State print page," a document stating Mary was the agent and two other unidentified documents. Although he expressed alarm and perplexity as a result of the meeting, he stated that he did not gain any other understanding from the meeting.

On January 20, 2011, Mary and Charles executed and filed a deed of conveyance and assignment purporting to convey royalty rights from the Ranch to Willie Sr., Laverna, Willie Jr., Carl, Charles, Mary, and David, with each receiving a fourteen percent interest. Charles testified that this deed was sent to Williams Energy, but there is no testimony of when that occurred. On October 21, 2011, Mary, as registered agent and director of the Ranch, and Charles and Willie Jr. as authorized officers and directors of the Ranch, executed and filed, a deed for correction and clarification of conveyance and assignment (the Correction Deed), purporting to correct the first deed. The Correction Deed is purported to be a conveyance of the disbursements of payments from royalty interests in the Ayers-Jackson Well from the Ranch to Mary, Charles, Willie Jr., Carl, and David, each with twenty percent. It also states that the conveyance was approved by a majority of the stockholders and board of directors at the November 20 meeting. Mary and Charles admitted that the conveyance was not approved at that meeting and that Carl, David, Laverna, and Junek were not notified of the filing of the Correction Deed.

In addition, Charles testified that, shortly after Willie Sr.'s death, he picked up a log splitter from the farm, explaining that everyone uses the ranch equipment. He stated that he had not returned it because he was afraid for his life, and he was advised by the sheriff's department not

9

to go back to the farm.  He also testified that he has a tractor[10] and some implements belonging to the Ranch in his possession, but that he did not remove them from the farm.  David testified that, when he asked Charles to return these items, Charles told him that "Daddy told me I could have [them]."

### C. Litigation History

The Flentge Shareholders filed this present action on November 4, 2011.  As previously noted,[11] after this suit was filed, the royalty payments from the W.L. Ranch 1H Well and the Ayers-Jackson Well were paid into the registry of the trial court.  Since that time, there have been periodic disbursements from the funds in the registry of the court to Willie Jr., Charles, Mary, Carl, and David, in excess of $100,000.00, each.  Royalty payments from the Buckman Well are being held in suspense by Williams Energy.

## II. Analysis

### A. The Order Granting the Flentge Shareholders' Motion for Partial Summary Judgment

The last will and testament of Willie Sr. bequeathed and devised all of his property, including his 100 shares of stock in the Ranch, to Laverna.  In their pleadings, the Flentge Shareholders sought a declaratory judgment that Willie Sr.'s testamentary transfer of the shares was not subject to any restrictions contained in the bylaws of the Ranch.  The provision in the original bylaws that is the source of this controversy provides, in pertinent part:

---

[10]David testified that the tractor was an old Massey-Ferguson garden tractor.

[11]*See supra* note 3.

10

**RESTRICTION ON TRANSFER OF SHARES**

No stockholder shall be permitted to assign, sell, mortgage, pledge or otherwise transfer or encumber their shares of stock to be issued hereunder, except that stockholders shall have the right to sell their stock upon compliance with the following terms and condition

    (1)    Any shareholder desiring to sell his stock shall first offer the sale of his stock to the Corporation upon the terms and conditions to be stipulated in such offer at par value ($1.00) per share.  Such offer shall be communicated by the stockholder offering to sell his stock by registered or certified mail addressed to the President of the Corporation with a copy of the offer to the Secretary of the Corporation.

The Flentge Shareholders filed a motion for partial summary judgment asking the trial court to declare that Willie Sr.'s testamentary transfer was not subject to any restriction.  The McAuley Shareholders filed a counter-motion for partial summary judgment asking the trial court to declare testamentary transfers subject to the Ranch's right of first refusal.  The trial court granted the Flentge Shareholders' motion without stating the grounds for its ruling.  On appeal, the McAuley Shareholders assert that the trial court erred in denying their motion and granting the Flentge Shareholders' motion, arguing that the restrictions on transferability contained in the bylaws apply to testamentary transfers.  The Flentge Shareholders respond that the McAuley Shareholders have not addressed all of the grounds asserted in their motion.  We agree and therefore affirm the trial court's order granting the Flentge Shareholders' motion for partial summary judgment.

The Flentge Shareholders' motion for partial summary judgment asserted two grounds upon which partial summary judgment was sought:  (1) that the restriction on "other transfers" contained in the bylaws does not apply to testamentary transfers and (2) that the restriction includes

11

a blanket prohibition on all transfers, other than sales and, therefore, that any purported restriction on testamentary transfers is void as an unreasonable restraint on alienation. Since the trial court's order granting partial summary judgment did not specify a particular ground on which the motion was granted, the McAuley Shareholders were required to negate all grounds on appeal. *Navarro v. City of Waco*, No. 10-08-00320-CV, 2010 WL 4351180, at *1 (Tex. App.—Waco Nov. 3, 2010, no pet.) (mem. op.) (citing *Peeler v. Baylor Univ.*, No. 10-08-00157-CV, 2009 WL 2964375, at *2 (Tex. App.—Waco Sept. 16, 2009, no pet.) (citing *Collins v. City of Corpus Christi*, 188 S.W.3d 415, 423 (Tex. App.—Corpus Christi 2006, no pet.))). "If the appellant fails to negate each ground on which the judgment may have been rendered, we must uphold the summary judgment." *Id*. (citing *Peeler*, 2009 WL 2964375, at *2); *see also Nall v. Plunkett*, 404 S.W.3d 552, 556–57 (Tex. 2013) (holding appellant waived ground for summary judgment not argued on appeal and reinstating trial court's judgment).

In their brief, the McAuley Shareholders address the Flentge Shareholders' contention that testamentary transfers are excluded from "other transfers" as that phrase is used in the corporate bylaws. However, they fail to challenge the Flentge Shareholders' summary judgment ground that as applied to testamentary transfers, the restriction constitutes an unreasonable restraint on alienation. We conclude that the McAuley Shareholders have waived this point of error by failing to brief it, and we affirm the trial court's order granting partial summary judgment to the Flentge Shareholders. *See Nall*, 404 S.W.3d at 556–57; *Navarro*, 2010 WL 4351180, at *1; *Peeler*, 2009 WL 2964375, at *2.

12

**B.** **The Trial Court's Directed Verdict on the Flentge Shareholders' Claims For Breach of Fiduciary Duty**

In their cross-appeal, the Flentge Shareholders assert that the trial court erred in granting the McAuley Shareholders' motion for directed verdict on their breach of fiduciary duties claims, arguing that there is sufficient evidence to raise fact issues regarding (1) whether the McAuley Shareholders breached their fiduciary duties and (2) whether the McAuley Shareholders obtained benefits as a result of their breach of fiduciary duties. In addition, the Flentge Shareholders complain that by directing a verdict on their breach of fiduciary duty claims, the trial court's verdict prevented them from presenting to the jury their claim for reimbursement of attorney fees and expenses under the Texas Business Organizations Code. Since we find that the trial court did not err in entering a directed verdict on the Flentge Shareholders' breach of fiduciary duties claims, we need not address their attorney fees issue.

**1.** **Standard of Review**

"In reviewing a directed verdict, we decide whether there is any evidence of probative value to raise an issue of material fact on the question presented, and we review the evidence in the light most favorable to the person suffering the adverse judgment." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 220 (Tex. 2011); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam); *see United States Invention Corp. v. Betts*, No. 10-14-00281-CV, 2016 WL 229378, at *2 (Tex. App.—Waco Jan. 14, 2016, pet. filed). The presence of some evidence "will defeat the directed verdict." *Exxon Corp.*, 348 S.W.3d at 220. Absent a defect in pleadings, a directed verdict may be proper in two situations: (1) "when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery" or (2) when

13

"the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Betts*, 2016 WL 229378, at *2.

A "no evidence" point will be sustained only if there is a complete absence of evidence establishing a vital fact, the only evidence offered to prove a vital fact cannot be considered due to a rule of law or evidence, there is less than a scintilla of evidence to prove the vital fact, or the opposite of the vital fact is conclusively established. *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010); *Betts*, 2016 WL 229378, at *2. More than a scintilla of evidence exists when the evidence permits the conclusions of reasonable and fair-minded people to differ. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). In our review, we credit favorable evidence if a reasonable fact-finder could do so and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Betts*, 2016 WL 229378, at *2. We may affirm the trial court's directed verdict on any basis if it can be supported by the record. *Reyna v. First Nat'l Bank in Edinburg*, 55 S.W.3d 58, 69 (Tex. App.—Corpus Christi 2001, no pet.).

### 2.    Analysis

The Flentge Shareholders filed their breach of fiduciary duties claims only on behalf of the Ranch. "Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions." *Ritchie v. Rupe*, 443 S.W.3d 856, 868 (Tex. 2014) (citing *Int'l Bankers Life*

14

*Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963), *superseded by statute on other grounds,* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(5)). Corporate officers also owe a fiduciary duty to their corporation. *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18 (Tex. App.—San Antonio 2006, pets. denied). These fiduciary duties include the duties of obedience, loyalty, and due care. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pets. denied) (citing *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)). Further, officers and directors may not usurp corporate opportunities for their personal gain. *Id.* at 408. In addition, they must act in good faith and deal fairly with the corporation. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942).

In order to prevail in a cause of action for breach of fiduciary duties, the claimant must show (1) the existence of a fiduciary relationship, (2) a breach by the defendant of its fiduciary duties, and (3) that the defendant's breach resulted in either (a) injury to the plaintiff, or (b) a benefit to the defendant. *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.); *Priddy v. Rawson*, 282 S.W.3d 588, 599 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Once the plaintiff shows that the defendant benefited by an alleged breach of his fiduciary duties, the burden of proof shifts to the defendant to show that his dealing was fair, honest, and equitable.[12] *See Swenson*, 517 S.W.2d at 260; *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964).

---

[12]The Flentge Shareholders argue that the burden of proof shifts to the defendant whenever the defendant places himself in a position in which his self-interest might conflict with his obligations as a fiduciary, even without showing a benefit to the fiduciary, citing *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257 (Tex. 1974), and *Slay v. Burnett Trust*, 187 S.W.2d 377, 387–88 (Tex. 1945). However, in *Swenson*, the plaintiffs' brother, in whom they had placed their confidence to handle their business affairs for over forty years, was also a director and officer of the museum to which the plaintiffs had, on the recommendation of their brother, made a sizeable gift. *Swenson*, 517

15

In their brief, the Flentge Shareholders point to Mary's actions (1) claiming to be a board member and the Ranch's registered agent, (2) communicating with Williams Energy, (3) opening the Prosperity Bank account in the Ranch's name, (4) signing the Correction Deed (allegedly to increase her share of the revenue in the Ayers-Jackson Well to twenty percent), and (5) failing to disclose these actions to the Flentge Shareholders as evidence creating a fact issue on their breach of fiduciary duty claims against Mary. Assuming, without deciding, that these actions were breaches of her fiduciary duties, the Flentge Shareholders point to no evidence, and we have found none, to show Mary benefited in any way, or that the Ranch was injured, from these actions.

Although Mary represented herself to be the registered agent when she filed the Ranch's annual franchise tax report, this neither harmed the Ranch, nor provided Mary with any tangible benefit. Her only communication with Williams Energy requested information about their royalties, but there is no evidence that Williams Energy provided this information.[13] Further, the undisputed evidence is that no corporate funds were placed in the Prosperity Bank account and that it was only used to pay for Mary's expenses related to her duties as secretary of the

---

S.W.2d at 259–60. Under those circumstances, the Texas Supreme Court noted that in opposing the Plaintiff's suit to set aside the gift, the museum, which had benefited from the transaction, had the burden to show that the transaction was fair and reasonable. *Id.* at 260. In *Slay*, certain trustees of the Burnett Trust personally profited from a loan made by the Trust to a third party. *Slay*, 187 S.W.2d at 386. Under these facts, the court noted that

> the duty of loyalty on the part of the trustee [prohibits] him from using the advantage of his position to gain any benefit for himself at the expense of his cestui que trust and from placing himself in any position where his self-interest will or may conflict with his obligations as trustee.

*Id.* at 387–88. Thus, in both of these cases, a benefit from the breach of fiduciary duties was shown, not merely that the fiduciary had placed himself in a position in which his self-interest might conflict with his fiduciary duties.

[13]Although the Flentge Shareholders claim that Mary communicated with Williams Energy about diverting oil revenues due the Ranch, there is no evidence supporting this claim.

16

corporation. In addition, although the Flentge Shareholders claim that the Correction Deed increased Mary's interest in oil revenues from fourteen percent to twenty percent, it is unclear that the deed was effective to do so.[14] Finally, while it is undisputed that the Correction Deed was executed by the McAuley Shareholders and filed of record, there is no evidence that Williams Energy made any change in the division of royalties paid to the McAuley Shareholders as a result of the deed.

The Flentge Shareholders point to Willie Jr.'s (1) participation in the opening of the Prosperity Bank account, (2) his failure to get Laverna's approval for the articles of amendment the McAuley Shareholders filed, (3) Mary's appointment as registered agent, and (4) the execution of the Correction Deed as evidence creating a fact issue on their breach of fiduciary duty claims against Willie Jr. As with Mary, there is no evidence that Willie, Jr. benefited from, or that the corporation was harmed by, any of these actions. In addition, the Flentge Shareholders point to Willie Jr.'s communications with Williams Energy for the purpose of having royalty payments changed to support their breach of fiduciary duty claim. However, there is no evidence that Williams Energy took any action as a result of this communication.

Finally, the Flentge Shareholders point to Charles' (1) claims to be a director, (2) signing of the Correction Deed, and (3) participation in opening the Prosperity Bank account as evidence creating a fact issue on their breach of fiduciary duty claims against Charles. As with Mary and

---

[14]The Correction Deed is ambiguous, at best. While expressing an intent to assign disbursements of payments from royalty interests of the Ranch in the Ayers-Jackson Well, it goes on to except the twenty percent interests of Willie Jr., Charles, Carl, Mary, and David from any such assignment.

17

Willie Jr., there is no evidence that Charles benefited from, or that the Ranch was harmed by, these actions.

In addition, the Flentge Shareholders point to Charles' appropriation of corporate property. Charles testified that, after his father's death, he removed a logsplitter from the farm, explaining that everyone uses the ranch equipment. He stated that he had not returned it because he was afraid for his life and that he was advised by the sheriff's department not to go back to the farm. He also testified that he has a tractor and some implements belonging to the Ranch in his possession, but that he did not remove them from the farm. There was no testimony explaining when, or under what circumstances, these items came to be in his possession. However, when David asked him to return the equipment, Charles claimed that their father had said he could have it.

An officer or director is accountable for corporate property under his control, and if he diverts corporate property for his own use, he breaches his duty of loyalty to the corporation. *Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied). For instance, in *Dooley*, two officers who diverted corporate funds to pay $420,000.00 in personal expenses breached their fiduciary duties to the corporation. *Id.* The testimony in this case shows that, during the history of this family-owned corporation, it was run with few corporate formalities. The undisputed testimony establishes that no minutes of any official meetings of the board of directors were kept, either before or after the death of Willie Sr.

Further, the testimony shows that Willie Sr. and Laverna executed the Williams Energy lease without the approval of the board of directors. Articles of amendment were executed and filed by Willie Sr. as president, without the approval of the board of directors and the shareholders

18

as required by the Business Corporations Act in effect at that time.[15] Rather, when the amended articles and bylaws were presented, none of the shareholders objected. Minutes of the shareholders meetings were allegedly kept, but were not attested to by the secretary or any other officer. After Willie Sr. died, this pattern continued.

Construing the evidence in the light most favorable to the Flentge Shareholders, the evidence shows that, after Willie Sr. died, only one director remained, Laverna, who was also the first executive vice-president. Even though the bylaws required at least two directors, no action was taken by the Ranch or its shareholders to appoint new directors or to elect a new president. At the time of trial, there was still no president. David testified that he has been living on the property owned by the Ranch since April 2011 under an agreement with his mother to be operations manager. Without a functioning board of directors, this agreement to occupy the Ranch's property as his personal residence could not have been approved by the board. Further, there is no evidence that this agreement was approved by the shareholders, although they apparently acquiesced to David's occupation of Ranch property.

Moreover, the undisputed testimony shows that the family members regularly used the Ranch's equipment for their personal use. Within the context of a family-owned corporation that historically ignores corporate formalities, we believe there is a distinction between the customary activity of family members using corporate property and the wrongful diversion of corporate assets to the exclusive personal use of the officer or director that rises to the level of a breach of a

---

[15]The Ranch was organized under the Business Corporations Act, which required that the board of directors adopt a resolution proposing amendments to the articles and that the resolution receive an affirmative vote of the holders of at least two-thirds of the outstanding shares entitled to vote. *See* Act of May 25, 1973, 63d Leg., R.S., ch. 545, § 1, sec. 30, 1973 Tex. Gen. Laws 1486, 1505–06 (expired Jan. 1, 2010).

fiduciary duty, such as occurred in *Dooley*. On this record, we find there is no evidence that Charles' possession of the log splitter and other equipment was intended to be for his personal use, to the exclusion of the Ranch. Therefore, there is legally insufficient evidence that Charles breached any fiduciary duty to the Ranch.

Under this record, we find that there is no evidence that any of the actions by the McAuley Shareholders alleged to be breaches of fiduciary duties resulted in any injury to the corporation or benefit to the McAuley Shareholders. Therefore, we overrule the Flentge Shareholders' point of error.

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice

Date Submitted:    March 11, 2016
Date Decided:      June 8, 2016

20